Arthur J. GOLDBERG, Secretary of Labor, United States Department of Labor, Appellant,

v.

WARREN G. KLEBAN ENGINEERING CORPORATION, Appellee.

No. 19289.

United States Court of Appeals
Fifth Circuit.

June 6, 1962.

**856**

Morton Liftin, Jacob I. Karro, Attys., Dept. of Labor, Charles Donahue, Sol. of Labor, Jack H. Weiner, Atty., Dept. of Labor, Washington, D. C., Beverly R. Worrell, Regional Atty., Birmingham, Ala., for appellant.

William J. Threadgill and Dewitt T. Hicks, Jr., Columbus, Miss., for appellee.

Before BROWN and WISDOM, Circuit Judges, and DE VANE, District Judge.

JOHN R. BROWN, Circuit Judge.

We deal here with a single simple problem whether sales and installation as a subcontractor of plumbing, heating and air conditioning equipment in substantial industrial or commercial construction projects being performed by a general contractor constitutes "sales for resale" under the Retail Exemption of the Fair Labor Standards Act, § 13(a) (2), 29 U.S.C.A. § 213(a) (2). The Employer, who prevailed below, views it in quite a different way. Its brief pictures it as a spector. "This is an action by the largest employer in the world, the United States Government, against one of the smallest, the appellee. This suit is another example of the constant efforts of the Administrator of the Fair Labor Standards Act to expand the coverage of the Act beyond the contemplation of Congress and the express language of the statute. The Administrator has long contended, though without support from the Courts, that everyone is covered by the Act, except those specifically exempt. Now, the contention is made that the exception applies to no one, unless they can prove it." This preface then closed with a conscious awareness of the difficulties: "We accept the burden."

The Employer's strong reaction has at least a plausible, even if not, perhaps legally sufficient, basis. The Secretary of Labor, who is not only an important part of "the largest employer in the world" is here also as the formidable adversary championing the case for two young high school boys. One was working part time as a trainee in a vocational Diversified Occupation Program operated through cooperative efforts of the local Starkville, Mississippi High School and local businessmen. The other worked after school and on week ends to follow in the footsteps of millions of other American boys. Their pay, confessedly, was below the statutory minimum, and on the rare occasions of overtime hours during two weeks, it did not satisfy the requirement of time and a half.

But in extending this commendable assistance in the practical training of future citizens in industrial skills, and the even more important virtues of thrift and industry, the Employer did not adequately reckon with the law. Undoubtedly from a sincere lack of specific knowledge of the law, the Employer failed to handle this training employment under the apprentice provisions of the Act. § 14, 29 U.S.C.A. § 214. With no indication of dissatisfaction from the boys, the Employer found itself facing a sort of biting-the-hand-that-feeds-claim asserted in their behalf by the strong and resourceful voice of the Secretary pursuant to their statutory written request. § 16(b), 29 U.S.C.A. § 216(b); see Mitchell v. Mitchell Truck Line, Inc., 5 Cir., 1961, 286 F.2d 721, 726–727.

The immediate response was a denial of coverage flowing from a belief presumably that this enterprise was just another retail establishment in Starkville, Mississippi, too far removed from the

stream of interstate commerce to be under the Act. This was undoubtedly influenced also by the nature of the work done by the two young boys, one of whose jobs was essentially that of a janitor. But at the commencement of the trial, the Employer—now presumably aware that coverage depends on the nature of the duties of the particular employee in commerce or in the production of goods for commerce, Mitchell v. Jaffe, 5 Cir., 1958, 261 F.2d 883; Maneja v. Waialua Agricultural Co., 1955, 349 U.S. 254, 75 S.Ct. 719, 99 L.Ed. 1040, and that a Court might have to hold that these boys were directly handling at least a few shipments being sent into or received from interstate commerce—stipulated that the two boys were covered. This was done to bring into sharp focus and to permit, as entirely proper, a clear cut testing of the Employer's fundamental contention that the whole operation was exempt as a retail establishment. But as F.R.Civ.P. 36 (b), 28 U.S.C.A. provides, and as the parties explicitly stated, this stipulation was for this day and train only, for this cause and no other. We emphasize this to make doubly sure that neither the judgment of this Court nor anything we say is understood to be a holding, or even an intimation, of the general amenability of this Employer or any phase of its operations to coverage under the Act.

■ This also makes it advisable for us to put this decision on the narrowest possible basis. Consequently, we resist the importunities of the Secretary to make this more of a *cause celebre* by examining into the general status of the Employer's operations to determine whether it really was a "retail or service establishment" who "is recognized as retail sales or services in the particular industry." The same is true as to the collateral question of the kind of evidence, whether subjective or objective, required to satisfy that test. What—and all—we determine is that these sales under subcontracts to general contractors constituted sales for resale and being in excess of the permissible 25%, the exemption collapses automatically.

The Employer is engaged in the business of sales and installation of plumbing, heating and air conditioning equipment in Starkville, Mississippi. Over 95% of its sales represent deliveries effected within Mississippi. It has a typical retail sales showroom for the display of air conditioning units, appliances and equipment, and without a doubt a considerable amount of the sales are in the traditional form of retail sales. It does not make sales to wholesalers or to other establishments engaged in the traditional resale of appliances or equipment to customers in the ordinary run of trade. However, a substantial part of its business in each of the years relating to this employment was in the form of subcontracts performed by it for general contractors in connection with public and private building projects located within Mississippi.

As shown by the records of the Employer, these contracts awarded to it in the period from September 1958 through May 1960 included air conditioning and heating installations for such projects as the Army Reserve Training Center, the Engineers Research Building at Mississippi State University, a building at Mississippi State College for Women, Fifth Street School at West Point, Mississippi, a housing project in Starkville, Mississippi, as well as a number of others. On a completed operations basis, these contracts awarded during this period totaled $470,047.35. Even when adjustment to a cash receipts basis is made for these contracts and its other business, the figures are still substantial. In the fiscal year July 1, 1958 through June 30, 1959, out of a total volume of $197,071.82, the Employer received 48.19% ($94,978.32) for work performed on subcontracts. In the fiscal year 1959–1960 out of a total volume of $196,255.81, it received 31.29% ($61,423.35) in work on such subcontracts.

Consequently, if the sales effected through these subcontracts amount to "sales for resale" as that term is used in § 13(a) (2), the Employer fails in its burden to establish the retail exemption

since these exceed substantially the permissible 25% tolerance.

The trial Judge did not, of course, try to minimize or ignore these substantially uncontradicted facts. Rather, he accorded to them an unusual legal significance. This was done in the setting of other circumstances thought to be important. These included the fact that the Employer did not solicit or submit competitive bids. It did, however, submit its non-competitive bids to general contractors for such projects. Likewise, all such subcontract work was on the basis that the Employer would remain directly liable to the ultimate owner of the building being constructed for warranty and service of this sometimes complicated machinery. This frequently resulted in a higher price which the owner presumably was willing to bear for added service. Similarly, the installation of all equipment under such subcontracts was done by the Employer's own organization. No sales, as such, were made to general contractors for installation by them or by other subcontractors hired for such work. While it was true that the general contractor generally made payment to the Employer of the amount of the subcontract price, the ultimate owner of the building had a vicarious liability by virtue of the Mississippi statutory lien for materials and supplies furnished.

The trial Judge, recognizing that the status of the sales under the subcontract was crucial, first noted that the Employer "was paid under the sub-contracts by the general contractor, but delivery was to and installation was on property belonging to the 'ultimate consumer' or 'owner.'" To this the Judge added the reasonable assumption that for the goods and services furnished by the Employer under the subcontracts, the general contractors received from the building owner more than it paid to the subcontractor. "This difference," the Judge then concluded, "would be in effect no more than a sales commission paid to a salesman by [the Employer] and would not change the character of the transaction from that of a sale directly to the 'owner' or 'ultimate consumer.'"

But this seems to be a case of what might have been, not what was. Conceivably a supplier could sell directly to the ultimate owner of a building, submitting the bid, and the invoice for payment to such owner directly, receiving directly from him payment for the work performed. But this is not what occurred here. No intricate web of legalistic theories of passage of title to the goods, warranties running finally to the owner, or the like, can convert this accepted commercial transaction between subcontractor and general contractor into one between the supplier and owner direct.

It is, of course, true that when the job is finally completed, and it is turned over by the general contractor to the owner upon the receipt of payment of the contract price, the transaction hardly fits in with the popular notion of a retail sale, or a sale of any kind for that matter. But this does not help the Employer. First, it only reinforces the great doubt—upon which we express no final opinion—that even as between a supplier and his customer direct, the design, layout, furnishing and installation of such complicated equipment under contracts running from $30,000 to over $100,000 really amounts to "retail sales or services in the particular industry." § 13(a) (2) Second, and more important, in the context of this Act, the general contractor is a significant intermediary. The owner looks to it for a completed operation. The owner pays that one party for all of the supplies and services which will have gone into the completed project under the general contract. Quite without regard to technical legal title in and to the supplies at various stages in the course of construction, or the right of suppliers or workers to impress the finished job with a mechanics lien, the purpose of the general contractor is to construct and turn over a completed facility and for which agreed compensation is paid. Moreover, when a subcontractor furnishes supplies and services, it does so with the expecta-

 

tion that they will be incorporated into the finished structure which thereafter is to be turned over by the contractor to another, the owner.

We agree with the First Circuit that the incorporation of such material into the property of the general contractor's customers constitutes sales for resale under § 13(a) (2). Sucrs. De A. Mayol & Co. v. Mitchell, 1 Cir., 1960, 280 F.2d 477, cert. denied, 364 U.S. 902, 81 S.Ct. 235, 5 L.Ed.2d 195. As did that Court, we can see "no difference between the resale of a completed article containing [an employer's] parts" which the Supreme Court held to be a sale for resale in Arnold v. Ben Kanowsky, 1960, 361 U.S. 388, 80 S.Ct. 453, 4 L.Ed.2d 393, and "the incorporation of [an employer's] material * * * into the property of a contractor's customers." 280 F.2d 477 at 481.

We are reminded frequently that it is "well settled that exceptions from the Fair Labor Standards Act are to be narrowly construed. A. H. Phillips, Inc. v. Walling, [1945,] 324 U.S. 490, 493; [65 S.Ct. 807, 89 L.Ed. 1095, 157 A.L.R. 876] * * *." Mitchell v. Kentucky Finance Co., 1959, 359 U.S. 290, 295, 79 S.Ct. 756, 3 L.Ed.2d 815. Even more recently the Court reiterated " * * * that these exemptions are to be narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit." Arnold v. Ben Kanowsky, supra, 361 U.S. 388 at 392, 80 S.Ct. at 456.[1]

The burden was on the Employer to establish that these significant portions of its operations in excess of the 25% tolerance were not "sales for resale." Far from meeting that burden, the facts support but one conclusion that these transactions were "sales for resale."

That was the sole issue for trial, and this conclusion prevents any judgment other than one for the Secretary and his two FLSA wards.

Reversed.

---

1. As note 10, 361 U.S. 388 at 394, 80 S. Ct. at 457 points out, the enactment of § 3(n) to specifically exclude from "resale" the "sale of goods to be used in residential or farm building construction, repair, or maintenance" evinces the general legislative "intent to classify other sales for use in articles to be sold as 'resale' ".