**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ARANGESAN SUNTHARALINKAM,
                         *Petitioner,*

v.

PETER D. KEISLER,* Acting
Attorney General,

                         *Respondent.*

No. 04-70258

Agency No.
A79-784-825

ORDER

Filed October 31, 2007

Before: Mary M. Schroeder, Chief Judge, Stephen Reinhardt,
Alex Kozinski, Pamela Ann Rymer, Andrew J. Kleinfeld,
Michael Daly Hawkins, Sidney R. Thomas,
Barry G. Silverman, M. Margaret McKeown,
Richard A. Paez, Marsha S. Berzon, Richard R. Clifton,
Jay S. Bybee, Consuelo M. Callahan, and Sandra S. Ikuta,
Circuit Judges.

Orders;
Dissent by Judge Kozinski

---

## ORDER

The order for publication filed October 18, 2007, is hereby
withdrawn and replaced with the attached order for publica-
tion. The dissent remains as originally filed.

---

*Peter D. Keisler is substituted for his predecessor, Alberto R. Gon-
zales, as Acting Attorney General of the United States, pursuant to Fed.
R. App. P. 43(c)(2).

14287

**ORDER**

The petitioner's unopposed Motion to Withdraw his Petition for Review is GRANTED. The government requests that dismissal be conditioned on vacatur of the panel opinion, which we agree is appropriate in the circumstances of this case. FRAP 42(b). The government also requests that the dismissal be conditioned on an award of court costs, which we decline to do. Therefore, the Petition for Review is DISMISSED. The panel opinion, reported at 458 F.3d 1034 (9th Cir. 2006), is VACATED. Each party shall bear its own costs.

---

KOZINSKI, Circuit Judge, with whom Judges KLEINFELD, CLIFTON and CALLAHAN join, dissenting:

My colleagues dismiss the petition for review by relying on a nine-line motion, filed almost a month after this case was argued and submitted, which says nothing more than that petitioner has suddenly lost interest in the case. Granting the motion in such circumstances casts aside the time and effort of the 15-judge en banc panel, as well as the time and effort of the full court in considering whether to take the case en banc in the first place. It also threatens the integrity of our processes by inviting manipulation by parties unhappy with the questions at oral argument and fearful of the result they believe the court is going to reach. Worse still, by allowing counsel to dismiss the petition without requiring confirmation from the client that he wishes to abandon the petition for review, we put petitioner's rights in jeopardy and leave the door open to future litigation as to whether counsel's representations can bind the client.

**1.** The motion the court grants today was filed on July 12, 2007, 24 days after oral argument, which was held on June 18, 2007. It reads as follows, in its entirety:

The Petitioner, Arangesan Suntharalinkam, through his attorney, Visuvanathan Rudrakumaran, states as follows:

> 1) Following the questions from the Bench pertaining to the relevance of the instant Petition for Review during oral argument, given the fact that the Petitioner is in Canada, the Petitioner's counsel discussed the matter with the Petitioner and his Canadian lawyer, Mr. Ceri Forbes.
>
> 2) The Petitioner hereby withdraws his Petition for Review before this Honorable Court.

There are three things worth noting about the motion. *First*, it is based entirely on facts known prior to the time the case was argued—indeed, before the case even went en banc. While the case was still pending before the three-judge panel, we were apprised that petitioner had departed for Canada and was seeking asylum there. We thereupon issued an order, dated January 19, 2007, asking the parties whether the case had been rendered moot by petitioner's departure. Both sides responded, confirmed petitioner's departure from the United States, and argued that the case was not moot. Petitioner represented repeatedly that he wished to have us set aside the BIA's ruling in his case and explained why. *See* pp.14290-92 *infra*.

Based on these representations, we continued our then-pending en banc process. A number of further memos were exchanged, every active judge of our court presumably studied the record and the en banc correspondence, and we voted to reconsider the case en banc. By so doing, a majority of the court determined that the case raised issues of sufficient importance to deserve en banc consideration. Thereafter, the

15 judges selected to sit on the en banc panel analyzed the briefs and record in preparation for argument, and 13 of those judges traveled to San Francisco (one judge is resident there and another one was prevented from appearing "because of a family emergency," Transcript of En Banc Oral Argument at 2). After the argument, we held a conference and voted on the outcome of the case, and two drafts of an opinion were circulated, which a majority of the panel commented on. In short, both the entire court and the en banc panel devoted considerable time and resources toward the resolution of the case after petitioner confirmed that he wanted the case resolved even though he had departed the United States. The only thing that has changed is that petitioner now, reportedly, no longer wishes us to decide the case.

*Second*, the motion to dismiss is expressly based on questions asked at oral argument. The colloquy to which petitioner refers to in his motion went as follows:

| | |
|---|---|
| THE COURT: | Can I ask you one question? Both sides seem to want us to either rewrite our rules or settle on old policy for immigration cases. This case your client's gone to Canada. He wanted to go to Canada in the first place. The opinion is off the books. And he doesn't want to come back to the United States. You really want to pursue this case? |
| MR. RUDRAKUMARAN: | Yes, your Honor. There are two—for two—for two reasons. One is the |

determination of this case is relevant in adjudicating his Canadian application there. So if you just let it stand, the I.J.'s finding that he is not credible, that will have an adverse impact there. And suppose if his claim is denied and if he's come back, then he will be in a more dangerous situation.

THE COURT:          So you've answered, you said "yes."

. . .

THE COURT:          Counsel, does Suntharalinkam want to come back to the U.S.?

MR. RUDRAKUMARAN: If—if the Canadians kick—denied his case then he will be here. Because his main thing, he cannot go back to Sri Lanka.

THE COURT:          Does he want to come back to the U.S. or would he rather be in Canada?

MR. RUDRAKUMARAN: He would like—if his cases get granted he would like to be in

|  | Canada. His case is pending. |
|---|---|
| THE COURT: | I thought he tried going to Canada in the first place when he snuck in from Mexico. |
| MR. RUDRAKUMARAN: | Sure. His original intention is to go to Canada because his relatives are living in Canada. He does not have anybody here. His original intention, present intention, is to stay in Canada. But suppose— |
| THE COURT: | He doesn't want to be in the U.S. |
| MR. RUDRAKUMARAN: | Supposing the Canadians send him back, then he has no place to go. |
| THE COURT: | They send him back then he's gonna go back. That will take care of that. Okay. Wonderful. |

Transcript of En Banc Oral Argument at 63-64, 65-66. As this exchange shows, petitioner's counsel was adamant that the case should be submitted and decided because an adverse IJ ruling would be damaging to his client in Canada and because, if Canada were to deny petitioner asylum, he would have no place to go, except back to his native country.

*Third*, petitioner has absolutely nothing to gain by withdrawing his petition for review and (as his counsel suggests) doing so may wind up hurting him because withdrawal of the petition will let the BIA's adverse ruling stand, including the IJ's ruling that petitioner is not credible. Withdrawing the petition would also preclude him from obtaining asylum in the United States, should he be denied similar relief in Canada.[1] On the other hand, if the court goes ahead and decides the case, it might rule in his favor, as did the three-judge panel, which would set aside the IJ's adverse credibility finding and open up an avenue for asylum in the United States. The *worst* that could happen to petitioner is that we would affirm the BIA's ruling, in which case he would be no worse off than if we allow him to withdraw his petition. Thus, whatever adverse effects may flow to other petitioners in other immigration cases from a denial of the petition for review (more on this later), petitioner himself has something to gain, and nothing to lose, by allowing the case to proceed to decision.

To my mind, the combination of these factors spells manipulation. What could possibly have motivated petitioner's counsel to file a motion seeking dismissal of the petition, which would do his client absolutely no good, and quite possibly some harm, a month after oral argument? The answer is obvious: Petitioner's counsel "sought dismissal for the purpose of evading appellate determination of certain questions." *United States* v. *Wash. Dep't of Fisheries*, 573 F.2d 1117, 1118 (9th Cir. 1978) (Kennedy, J.). He believed, based on the oral argument, that he would likely suffer an adverse ruling that would not only be harmful to petitioner, but to counsel's other clients (present and future) who seek relief from adverse rulings of the BIA. In that regard, it's worth noting that petitioner's counsel, though located in another circuit, frequently represents immigration petitioners in our court.[2] An adverse

---

[1]Of course, he also gives up the possibility of filing a cert petition, should he lose before us.

[2]*See, e.g.*, *Annachamy* v. *Gonzales*, No. 07-70336; *Razik* v. *Gonzales*, 06-75630; *Senthinathan* v. *Gonzales*, No. 06-75531; *Partovi* v. *Gonzales*,

ruling in petitioner's case could undermine the petitions of counsel's other clients (present and future) which rely on our exceedingly petitioner-friendly caselaw. Nor are petitioner's counsel and his clients the only ones who would be hurt by an adverse ruling in petitioner's case. Briefs supporting petitioner were filed by no fewer than 4 amici, and counsel for one of the amici actually appeared and argued before us.

It is not too far-fetched to suspect that, following the argument, petitioner's counsel and counsel for amici listened to the recording of oral argument and concluded that things did not bode well—indeed, that the case could mark a significant change in our approach to IJ credibility rulings. While guessing the outcome of a case from questions at oral argument is tricky business, observers do it all the time, and often guess right.[3] Certainly, questions in this case suggested that some members of the panel were prepared to fundamentally reconsider our approach to reviewing IJ credibility rulings. Plus, petitioner's counsel made at least one highly damaging concession in answering questions from the bench.[4]

---

No. 05-77153; *Thevanayagam* v. *Gonzales*, No. 04-73319. In fact, after granting the petitions for review, we awarded $10,000 in attorney's fees in one of his cases, *see Thangaraja* v. *Gonzales*, 428 F.3d 870, 872, 877 (9th Cir. 2005), and over $8,000 in another, *see Lasitharan* v. *Gonzales*, No. 01-71539. Our immigration law precedents are also followed by other circuits, *see, e.g.*, *Secaida-Rosales* v. *INS*, 331 F.3d 297, 307-08 (2d Cir. 2003) (citing *Aguilera-Cota* v. *INS*, 914 F.2d 1375, 1382-83 (9th Cir. 1990)); *Gao* v. *Ashcroft*, 299 F.3d 266, 272 (3d Cir. 2002) (citing *Salaam* v. *INS*, 229 F.3d 1234, 1238 (9th Cir. 2000); *Ceballos-Castillo* v. *INS*, 904 F.2d 519, 520 (9th Cir. 1990)), so an adverse ruling in our court may also affect petitioner's counsel's practice in other courts as well.

[3]*See, e.g.*, Linda Greenhouse, Court Reviews Race as Factor in School Plans, N.Y. Times, Dec. 5, 2006, at A1 ("By the time the Supreme Court finished hearing arguments on Monday on the student-assignment plans that two urban school systems use to maintain racial integration, the only question was how far the court would go in ruling such plans unconstitutional.").

[4] THE COURT:          Now, focusing in on the route information, he tells the immigration

Moreover, the very question that seems to have triggered counsel's motion, quoted above, could have been interpreted as a suggestion that counsel would be well advised not to continue pursuing his petition.[5] While the argument transcript does not disclose which member of the panel opened this line of inquiry, it is quite clear from the recording, and counsel certainly were present and would remember. Coming from a judge who is generally favorably disposed to immigration petitioners, the question could reasonably be understood as suggesting that nothing good would likely come to petitioner or others similarly situated, if petitioner pressed on with his petition for review. Counsel may reasonably have concluded that petitioner himself had little to gain, but that others with similar claims would have a great deal to lose, if the en banc court accepted the government's invitation to reconsider our approach to IJ credibility findings.

---

officer when he's asked to explain it: I did it because I was told that if I told them the truth I'd be sent back. Now, it doesn't sound to me like a mistake. To me that sounds like he's saying: I was told if I don't lie to the Americans in my asylum application I will not get asylum. Sounds to me like an admission of deliberate falsehood. Is there some reason you think that's not a fair statement?

MR. RUDRAKUMARAN: It's a fair statement.

Transcript of En Banc Oral Argument at 31.

[5]I don't suggest that it was meant as such, but it could reasonably have been so interpreted. Our questions at oral argument tend to be both candid and wide-ranging, and they do occasionally disclose the leanings of particular judges. One unfortunate byproduct of today's ruling may well be that judges will be more guarded in their questioning lest they precipitate the kind of unfortunate reaction we see here.

Finally, by granting motions for voluntary dismissal in cases that have already been argued and submitted, we create a strong incentive for leaking the outcome of cases after conference and before the opinion is issued. In an institution of any size, security is always an issue. When an en banc panel is deliberating, something like 100 people—judges, law clerks, externs, secretaries, court staff—will know the outcome of a decision shortly after conference. No responsible institution should lightly countenance the possibility of leaks, and we should not overlook the perverse incentives we're creating in granting a motion to dismiss that was filed after the likely outcome of the case was known within the institution but had not yet been made public.

Our court, like others, has recognized that "the court has discretion in deciding whether to dismiss an appeal on appellant's motion under [Fed. R. App. P.] 42(b)." *Shellman* v. *U.S. Lines, Inc.*, 528 F.2d 675, 678 (9th Cir. 1975). While "[s]uch motions are generally granted, [they] may be denied in the interests of justice or fairness." *Am. Auto. Mfrs. Ass'n* v. *Mass. Dep't of Envtl. Prot.*, 31 F.3d 18, 22 (1st Cir. 1994) (citing *Wash. Dep't of Fisheries*, 573 F.2d at 1118). Exercising this authority, courts have refused to grant motions for voluntary dismissal that were filed after cases were argued and submitted. In *Ford* v. *Strickland*, 696 F.2d 804 (11th Cir. 1973) (en banc) (per curiam), an en banc panel of the Eleventh Circuit started its lengthy opinion as follows:

> This cause, after a decision by a panel, was taken en banc for the purpose of resolving for this Circuit several important issues that repeatedly arise in capital cases. After full briefing, extended oral argument, and several months of deliberation during which the judges of the Court sought to resolve and reconcile the various issues involved, a communication was received purporting to be a request by defendant Ford that all appellate proceedings cease and that the state judgment be carried out.

> The Court determines that, considering Ford's communication as a motion to dismiss his appeal, the motion is untimely.

*Id.* at 807 (citations omitted).

In *Khouzam* v. *Ashcroft*, 361 F.3d 161 (2d Cir. 2004), also an immigration case, the government stipulated to an order vacating the BIA's decision. In refusing to grant the joint motion, the court noted:

> At oral argument, we expressed doubts as to the soundness of the Attorney General's definition of torture . . . . In addition to being dispositive in Khouzam's case, this is clearly an issue of public importance. For the government to agree to a vacatur two weeks *after* oral argument suggests that it is trying to avoid having this Court rule on that issue. We therefore decline to grant the order that the parties have agreed to. Instead, we will review Khouzam's CAT petition and grant or deny it according to its merits.

*Id.* at 168.

Finally, the Seventh Circuit in *Albers* v. *Eli Lilly & Co.*, 354 F.3d 644 (7th Cir. 2004) (per curiam), held as follows, when confronted with a situation very much like ours:

> After a draft of this opinion had been written, Albers moved to dismiss the appeal under Fed. R. App. P. 42(b), which provides in part: "An appeal may be dismissed on the appellant's motion on terms agreed to by the parties or fixed by the court." The parties had not agreed on terms, and Lilly filed a response making it clear that it would not do so. In Lilly's view, the law firm representing Albers, which has a substantial portfolio of DES cases—most of which

are filed in the District of Columbia to take advantage of that jurisdiction's favorable limitations rules, even though counsel recognize that they will be transferred for trial or decision elsewhere—is attempting to manipulate the formation of precedent by dismissing those proceedings that may lead to an adverse decision while pursuing others to conclusion. Counsel for Albers filed a response essentially conceding that this is the plan, and that because the oral argument had not gone well he decided to dismiss the appeal and try again, with a different client, at a different time or in a different court. Counsel contends that Lilly sometimes behaves opportunistically too and that both sides should have this option.

When the parties do not agree on terms, dismissal is discretionary with the court. Doubtless there is a presumption in favor of dismissal, but the procedure is not automatic. . . . One good reason to exercise discretion against dismissal is to curtail strategic behavior. See, e.g., *American Automobile Manufacturers Association* v. *Massachusetts Department of Environmental Protection*, 31 F.3d 18 (1st Cir. 1994); *United States* v. *Washington Department of Fisheries*, 573 F.2d 1117 (9th Cir. 1978). Cf. *U.S. Bancorp Mortgage Co.* v. *Bonner Mall Partnership*, 513 U.S. 18, 115 S. Ct. 386, 130 L. Ed. 2d 233 (1994) (judicial decision created with a significant investment of public resources is not a bargaining chip that the parties may elect to have vacated).

*Albers*, 354 F.3d at 646. I am aware of no case where a motion for voluntary dismissal was granted when it was filed after the case was argued and submitted for decision.

As the Second and Seventh Circuits noted, courts must be particularly wary of abetting "strategic behavior" on the part of institutional litigants whose continuing interest in the

development of the law may transcend their immediate interest in the outcome of a particular case. Counsel for petitioner, like counsel for appellant in *Albers* and the Department of Justice in *Khouzam*, is precisely such an institutional litigant, and his interest in the welfare of one particular client may be overshadowed by concerns about his other clients and his own livelihood. *See* pp.14293-94 & n.2 *supra*. Certainly, counsel for amici, which not only thoroughly briefed the issue but participated in the oral argument of this case, qualify as institutional litigants who have no responsibility at all to petitioner and whose interests are wholly those of the great body of immigration petitioners who appear in our court; the amicus briefs, including their statements of interest, leave no doubt on this score. That petitioner's counsel has filed a motion that can do his client zero good, and possibly great harm, for no apparent reason other than to avoid an adverse ruling that would affect other parties in other cases, militates strongly against exercising our discretion in favor of granting the motion at this late date.

All this would be of no consequence if petitioner could simply render the case moot by moving to dismiss the petition. But Fed. R. App. P. 42(b) gives us discretion whether to allow a voluntary dismissal and, if so, on what terms. *Shellman*, 528 F.2d at 678. We ought to be chary in finding mootness in a situation such as this, where, by doing so, we leave ourselves at the mercy of institutional litigants who can pull out the mootness trump card whenever they come to believe that their institutional interests would be best served by avoiding a decision and hoping for a better outcome "with a different client, at a different time or in a different court." *Albers*, 354 F.3d at 646.[6]

*Albers* resolved the mootness issue as follows:

---

[6]The concern about a "different court" is not trivial. Presenting the same issues to another en banc panel of our court will ensure a different, and perhaps more favorable, en banc draw. *See* 9th Cir. R. 35-3.

> The case is not moot, because costs abide the out-
> come and have yet to be determined; in the absence
> of an agreement, there may be further dispute. (Sanc-
> tions are also a possibility, though Lilly has not
> invoked Fed. R. App. P. 38.) Albers certainly has not
> promised to pay whatever costs or sanctions Lilly
> sees fit to demand. We think it best, largely for rea-
> sons parallel to those that animated the decision in
> *U.S. Bancorp*, to carry through so that the invest-
> ment of public resources already devoted to this liti-
> gation will have some return, and an attempt to make
> the stock of precedent look more favorable than it
> really is may be foiled.

*Id.*

*Albers* suggested two possible rationales for concluding that the case is not moot. The first, and most direct, is the question of possible costs and sanctions. Whether costs are to be assessed, against whom and in what amount is, as in *Albers*, for us to decide. Because that decision depends, to some extent, on the outcome of the case, we must decide the merits in order to resolve it. Also as in *Albers*, sanctions are a possibility. As noted, petitioner and his counsel had every opportunity to withdraw the petition after petitioner left for Canada. Instead, they put the Justice Department and our court to the expense and effort of holding an en banc argument—at substantial cost to the government. Petitioner has shown no justification for filing this motion at such a late date, and it is at least a theoretical possibility that we could impose sanctions sua sponte for what appears to be abusive conduct on petitioner's part. *See Chambers* v. *NASCO, Inc.*, 501 U.S. 32, 46 (1991). Sanctions might also be imposed for filing a frivolous petition for review challenging the IJ's credibility finding when the record shows, and petitioner's counsel admits, *see* p.14294-95 n.4 *supra*, that petitioner lied under oath in his asylum application.

*Albers* also contains a second rationale based on *U.S. Bancorp Mortgage Co.* v. *Bonner Mall Partnership*, 513 U.S. 18 (1994). In *U.S. Bancorp*, the Supreme Court refused to follow its normal vacatur rule announced in *United States* v. *Munsingwear, Inc.*, 340 U.S. 36, 40-41 (1950), where the party sought vacatur after voluntarily settling a case. *U.S. Bancorp*, 513 U.S. at 29. The Court denied vacatur, citing precisely the kinds of institutional concerns *Albers* relied on. *Id.* While *U.S. Bancorp* is certainly not directly on point, the reasons it gives for denying vacatur in cases where a party voluntarily settles a case—avoiding manipulation of precedent and the preservation of scarce public resources—apply in full force to our case. After all, we have explained that parties shouldn't be allowed "to seek the benefits of a favorable judicial decision but escape some of the more significant adverse consequences of an unfavorable judgment." *Armster* v. *U.S. Dist. Court*, 806 F.2d 1347, 1356 (9th Cir. 1986).[7]

The Supreme Court has recognized "the flexible character of the Art. III mootness doctrine," *U.S. Parole Comm'n* v. *Geraghty*, 445 U.S. 388, 400 (1980), by creating multiple exceptions to this doctrine. Were it necessary to do so—and I don't believe it is—I would invoke an exception to the mootness doctrine where a party moves for dismissal of an appeal based on previously known facts, after the case has been argued and submitted for decision.[8] Such an exception

---

[7]In *Armster*, we presciently anticipated the Supreme Court's ruling in *U.S. Bancorp*. The *Armster* panel relied on three separate rationales to reach the conclusion that it was not required to vacate its opinion under *Munsingwear*, even though the case had technically become moot; one of those rationales was that the case is not moot under the "voluntary cessation" of activities doctrine. 806 F.2d at 1357-58 (citing *United States* v. *W. T. Grant Co.*, 345 U.S. 629 (1953)). *Armster*, like the "voluntary cessation" cases, focuses on the need to avoid manipulation of precedent and the squandering of public resources—precisely the considerations that would militate against dismissal of our case at this late stage.

[8]The case would be quite different if petitioner had filed his dismissal motion based on changed circumstances beyond his control—such as that he had been granted asylum in Canada, or there had been a regime change in his native country so that he no longer feared persecution if he were returned there. Petitioner here cites nothing of the sort. *See* pp.14288-89 *supra*.

would parallel the exception to mootness for cases capable of repetition yet evading review, *see, e.g.*, *Roe* v. *Wade*, 410 U.S. 113, 123-29 (1973), in that both recognize the realities of litigation and the need to preserve the integrity of the judicial process.

As we are well aware, cases *can* be litigated very swiftly when the need arises—the Pentagon Papers Case, *N.Y. Times Co.* v. *United States*, 403 U.S. 713 (1971) (per curiam), was completed, from the day the district court issued its injunction to the day the Supreme Court issued its multiple opinions, in 15 days. *See United States* v. *N.Y. Times Co.*, 328 F. Supp. 324 (S.D.N.Y. 1971). Yet such speed takes a considerable toll on the litigants and the judicial process and cannot be invoked in more routine cases. The capable-of-repetition-yet-evading-review exception to mootness is thus best viewed as a doctrine, not of necessity, but of judicial convenience—a recognition that courts need time to resolve cases in a thoughtful and deliberative manner, and that Article III does not stand in the way of deciding cases that are technically moot but cannot readily be decided while there is a live controversy.

A parallel rationale supports an exception to mootness where it is clear that one of the parties is seeking dismissal in order to manipulate the judicial process to its advantage. Many of the considerations that underlie judicial reluctance to decide moot cases do not exist, in any event, where the case has been argued and submitted because the parties did present a concrete controversy and vigorous briefing and argument before submission; all that's left is for the court to rule based on the vigorous presentations already offered by the parties. *See Baker* v. *Carr*, 369 U.S. 186, 204 (1962) (Article III's case or controversy requirement ensures "concrete adverseness"); *see also* R. Fallon, Of Justiciability, Remedies, and Public Law Litigation: Notes on the Jurisprudence of *Lyons*, 59 N.Y.U. L. Rev. 1, 51 (1984) (the "functional requisites of effective adjudication" are "[c]oncrete facts and adversarial presentation").

Cases such as *Claiborne* v. *United States*, 127 S. Ct. 2245 (2007) (per curiam), *Deakins* v. *Monaghan*, 484 U.S. 193 (1988), and *Comer* v. *Schriro*, 480 F.3d 960 (9th Cir. 2007) (en banc) (per curiam), are distinguishable. *Claiborne* became moot because petitioner died after the case was submitted, so there was no possibility of manipulation. 127 S. Ct. at 2245. Neither *Deakins* nor *Comer* involved institutional litigants, so there was also no risk of manipulation. *See Deakins*, 484 U.S. at 195; *Comer*, 480 F.3d at 961. More importantly, in both of these cases, the party seeking dismissal had expressed its wish not to pursue the case long before argument and submission; both involved situations where the parties had no interest in pursuing their remedies, and had made that position clear before oral argument, so "strategic behavior" was not an issue. *See Deakins*, 484 U.S. at 199 n.3; *Comer*, 480 F.3d at 961-62.

I would treat quite differently a case like this one where the party seeking dismissal has an obvious institutional interest, tests the judicial waters by listening to the court's questions at oral argument, submits the case for decision and then, for no apparent reason, gives up the possibility of victory for absolutely no gain in return. We owe it to the judicial process, and to the litigants who appear before us in good faith, to preserve the integrity of the system by denying such an obvious effort at subverting the orderly development of the law through artful dismissal of the petition long past the eleventh hour.

**2.** Even were I inclined to grant dismissal after submission in some circumstances, I would not do so in this case because we only have petitioner's counsel's word that petitioner does, indeed, wish to have his petition for review dismissed. As previously explained, petitioner has nothing to gain from a dismissal, as he gives up his chance of reversing the IJ's adverse credibility finding and deprives himself of the possibility of asylum in the United States. Counsel has, moreover, made

inconsistent representations on this issue, and he has an institutional and personal interest adverse to his client.

Under such circumstances, we should exercise our discretion by requiring that counsel provide us with a declaration from petitioner himself, confirming that he wishes to dismiss his petition. Furthermore, I would insist that petitioner express his understanding that he is giving up the possibility of asylum in the United States and getting nothing of benefit in exchange. As things stand, we have no assurance—not even the representation of counsel—that petitioner has been fully advised before giving up his rights.[9] If petitioner is, indeed, willing to give up his petition here, a certification signed by him should not be difficult to obtain. Insisting on such a certification would not only safeguard petitioner's rights, but would avoid the possibility that petitioner will seek to reopen the proceedings at a later date, claiming that he was not adequately advised by his lawyer. Such a claim would not be implausible because dismissal of the petition makes no sense at all from petitioner's perspective. If petitioner's counsel did not obtain his client's fully informed consent, petitioner may well be able to claim ineffective assistance of counsel, lack of informed consent or some similar basis for reinstating his appeal.

Will we be prepared to deny petitioner his rights if he presents a credible claim that his lawyer sacrificed his petition in order to serve the interests of other clients and of the lawyer himself? I seriously doubt it. *See Cmty. Dental Servs.* v. *Tani*, 282 F.3d 1164, 1171 (9th Cir. 2002) ("[C]onduct on the part

---

[9]Because counsel is in the United States, while petitioner is in Canada (and perhaps in custody), it is unlikely that counsel and petitioner met in person to make this decision. There is, moreover, the mysterious mention of petitioner's Canadian lawyer. It is unclear from counsel's terse motion the extent to which he relied on a communication directly with his client and to what extent he relied on instructions conveyed by Canadian counsel. As we know from playing "Telephone," the longer the communication chain, the more likely there is to have been a misunderstanding.

of a client's alleged representative that results in the client's receiving practically no representation at all clearly constitutes gross negligence, and vitiating [sic] the agency relationship that underlies our general policy of attributing to the client the acts of his attorney."). At a bare minimum, then, if we are inclined to grant the motion to dismiss, we should take simple steps to ensure that petitioner himself seeks such relief and is not the victim of deceit or misunderstanding. Respect for petitioner's rights and the integrity of the judicial process demands at least that much.

PRINTED FOR
ADMINISTRATIVE OFFICE—U.S. COURTS
BY THOMSON/WEST—SAN FRANCISCO

The summary, which does not constitute a part of the opinion of the court, is copyrighted
© 2007 Thomson/West.