In the

# United States Court of Appeals
## For the Seventh Circuit

No. 13-3818

RAMON ALVARADO, *et al.*,

*Plaintiffs-Appellants*,

*v.*

CORPORATE CLEANING SERVICES, INC., *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 07 C 6361 — **Edmond E. Chang**, *Judge*.

ARGUED FEBRUARY 10, 2015 — DECIDED APRIL 1, 2015

Before POSNER, MANION, and TINDER, *Circuit Judges*.

POSNER, *Circuit Judge*. The plaintiffs in this suit under the
Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.*, are 24
window washers employed currently or formerly by Corpo-
rate Cleaning Services, the defendant (along with a couple of
executives of the company, who need not be discussed sepa-
rately). There is a procedural hurdle to our resolving the ap-
peal, which is by the plaintiffs from an adverse judgment in
the district court. But we defer consideration of it to the end

of our opinion because understanding the hurdle requires acquaintance with some of the facts germane to the substantive issue presented by the appeal.

CCS, as the defendant is commonly referred to, is Chicago's largest provider of window-washing service to high-rise commercial and apartment buildings (average height 30 to 40 stories), along with some governmental and other non-commercial, nonresidential buildings, such as hospitals and museums; fewer than 1 percent of its customers are private homeowners. See generally Corporate Cleaning Services, www.corporatecleaning.com (visited March 30, 2015, as were the other websites cited in this opinion). The company employs about 100 window washers.

A provision of the Fair Labor Standards Act requires an employer engaged in interstate commerce (as CCS is conceded to be) to pay its hourly workers at least one and a half times their normal hourly wage for any hours they work in excess of 40 hours a week, 29 U.S.C. § 207(a)(1), which CCS has conceded it has not done for the plaintiffs in this case. But there is an exception, pertinent to this case, that requires satisfaction of three conditions: the worker's regular pay exceeds one and a half times the federal minimum wage (a condition conceded to be satisfied by the plaintiffs, so we'll discuss it no further); "more than half his compensation for a representative period (not less than one month) represents commissions on goods or services"; and he must be employed by "a retail or service establishment." 29 U.S.C. § 207(i). So the issues presented by the appeal are whether CCS's window washers are paid mostly by commission and whether CCS is a retail or service establishment. The district court granted summary judgment in favor of CCS with re-

gard to its status as a retail or service establishment and, af-
ter a three-day bench trial, ruled in favor of CCS on the
commission requirement. And so the suit was dismissed,
precipitating this appeal.

When CCS receives a window-washing order, it calcu-
lates the number of "points" to assign to the job based on the
job's complexity and the estimated number of hours that the
window washers will take to complete it; usually each
worker assigned to the job gets the same share of the points
allocated to it. CCS pays each window washer the number of
points allocated to him multiplied by a rate, specific to each
worker, that is specified in the company's collective bargain-
ing agreement with the union that represents the employees,
the Service Employees International Union (SEIU). CCS also
uses the number of points assigned to a job to determine the
price it charges to customers; naturally it uses a higher ratio
of dollars per point for setting its price for customers than
for compensating its employees, so that it can make a profit.
And CCS regularly makes price adjustments, such as adding
the costs of permits and equipment rentals, rounding the
price to the nearest $25 increment, and reducing the price
because of competition or a desire to maintain good relations
with customers. These adjustments cause the percentage of
the price attributable to window washers' compensation to
vary from job to job.

The annual pay of those plaintiffs employed throughout
2007 (the year the suit was filed) ranged from approximately
$40,000 to $60,000. Although the collective bargaining
agreement contains a provision entitling the window wash-
ers to be paid by the hour and thus (as hourly workers) to
receive overtime pay, apparently the union has never tried

to enforce this provision, and—apparently content with the company's compensation system—has kept its hands off this litigation. Apart from the plaintiffs, the window washers employed by CCS appear to be content with the challenged compensation system as well. CCS distributed written notice to them that they were entitled to hourly and overtime payment, yet except for a six-month period (December 2007 to June 2008) they chose the points-based system of compensation instead.

The company doesn't call its compensation system a "commission" system, but instead a "piece-rate" (or, equivalently, "piecework") system, which is not subject to the section 207(i) exemption. See 29 U.S.C. § 207(g). But the nomenclature is not determinative; the "word ['commission'] need not be used for the exemption to be applicable." *Yi v. Sterling Collision Centers, Inc.*, 480 F.3d 505, 508 (7th Cir. 2007). There are real differences between the two compensation systems (commission and piecework), and the reality, which overcomes the nomenclature, is that CCS's system is a commission system. In a piece-rate system a worker is paid by the item produced by him: so much per scarf, for example, if his job is to make scarves. In a commission system he is paid by the sale—so if he works for a shoe store he's paid a specified amount per pair of shoes that he sells. Thus the scarf worker is paid for making scarves even if they haven't been sold— that is, even if he's producing for inventory—while the shoe salesman is paid only when he makes a sale. In the present case, as in the shoe-store example, the window washers are paid only if there's been a sale, namely a sale of window-washing service to a building owner or manager.

The parties' briefs spill much ink over whether a commission system requires that the compensation bear an "identifiable and consistent correlation" to the price charged to customers or that the compensation just be "proportional and correlated" to the price. The plaintiffs urge the former, the defendant the latter, as the latter is a more accurate description of CCS's compensation system. Our decision in *Yi*, cited earlier, which involved auto repair, supports CCS's position. As in this case, the employer in *Yi* made adjustments to the price of its service for such things as differences in costs of materials used. The adjustments made the percentage of the price attributable to its auto mechanics' compensation vary from repair to repair. We held that this didn't invalidate the compensation system as a commission system. *Yi v. Sterling Collision Centers, Inc.*, *supra*, 480 F.3d at 509–10. The Third Circuit agreed. *Parker v. NutriSystem, Inc.*, 620 F.3d 274, 283 (3d Cir. 2010) ("we decline to adopt a test that requires a commission, under § [20]7(i), to be strictly based on a percentage of the end cost to the consumer"). We are unaware of any contrary authority.

A more important consideration is that commission-compensated work involves irregular hours of work. See *Yi v. Sterling Collision Centers, Inc.*, *supra*, 480 F.3d at 510; *Mechmet v. Four Seasons Hotels, Ltd.*, 825 F.2d 1173, 1176–77 (7th Cir. 1987); *Gieg v. DDR, Inc.*, 407 F.3d 1038, 1045–46 (9th Cir. 2005). An employee who is paid by the sale is not a commission worker if his sales are made at a uniform rate (e.g., one sale per hour), so that the ratio of his hours worked to his pay is constant. For in that case his pay is effectively hourly. That's why piece-rate workers are not within the commission exception: because they keep producing even when no sale is imminent, the relation between the hours they work

and their output tends to be constant. But CCS's employees can work only when CCS is hired to wash a building's windows. Employment necessarily is irregular (rather than the standard eight-hour workday) because of the peculiar conditions of the window-washing business. Washing the outside of windows of tall buildings while standing on scaffolds or dangling from harnesses is dangerous work and CCS is justly proud of its excellent safety record. That record necessitates irregular work time by its employees. The largest source of danger to high-rise window washers is weather; window washers do not wash the outside of windows (and it is the outside that requires the most frequent washing) in high winds, rain, snow, sleet, or freezing temperatures. Another reason that work slackens off in the winter months is that managers of residential buildings often will not allow window washing before 9 a.m., in order to avoid disturbing the residents; a late start, coupled with the early darkness on winter days, shrinks the amount of time window washers can work. And obviously there is no production of window washing for inventory, which would allow CCS to smooth out these fluctuations in working hours. There is so little work during much of the winter than many of the workers take long vacations in Mexico. (Oddly, most of CCS's window washers come from a single small town in Mexico— Villa Garcia de la Cadena. See Vicki Cox, "Window Washer Scrubs Chicago Skyline," *American Profile*, July 25, 2012, http://americanprofile.com/articles/chicago-window-w asher—a colorful account of a Chicago window washer from that Mexican town.)

The window washers make up for this slack by often working more than eight hours a day during spring, summer, and fall, though even in those months there are times

when they can't work eight hours a day, whether because of other work being done on the building, the manager's failure to notify residents of the window washing, a slowdown in demand for CCS's services by building owners or managers, or, most exotically, attacks on the window washers by peregrine falcons. Formidable predators whose speed of flight can exceed 200 miles an hour, these birds build nests, for breeding and taking care of their fledglings, on the roofs of tall buildings in Chicago. When a nesting falcon sees window washers high on its building, near its nest, it may attack them, thus preventing them from completing their work. For a live video of such an attack, see "Falcons Attack Window Washers 2," *YouTube*, www.youtube.com/watch?v=e2Mvg GA8Q7I.

The result of these impediments to steady work is that a window washer can't count on working 40 hours each week for an entire year. This is the reason for exempting his employer from the requirement of paying the worker time and half for overtime. Suppose the hourly wage in two separate businesses is an identical $15. In one business the work is steady and the worker works 2000 hours a year ($15 per hour x 40 hours x 50 weeks = $30,000). There is no overtime, so no requirement of time and a half pay ($22.50) per overtime hour. In the other business the worker also works 2000 hours a year, but he does no work at all for 10 weeks of the year and in the remaining 40 weeks (we're assuming that both workers take a two-week unpaid vacation) he works 50 hours a week. Were he entitled to overtime for 10 hours each week for the 40 weeks he works, his total wages for the year would be $15 per hour x 40 hours (= $600) + $22.50 x 10 hours (= $225), a total of $825 a week, which times 40 weeks equals $33,000. In this example, both workers work the same

number of hours a year, at the same job, but the one who works irregular hours is paid 10 percent more. That doesn't make any sense. The anomaly, which we said in *Yi* is "the rationale for the commission exemption from the FLSA's overtime provision," *Yi v. Sterling Collision Centers, Inc.*, *supra*, 480 F.3d at 508, is avoided by recognizing that the second set of workers, corresponding to our window washers, are commission workers and therefore have no statutory entitlement to overtime pay.

But to prevail CCS must show not only that its employees are paid by commission, but also that the company is a retail or service establishment, terms not defined in the statute. A "retail establishment" sounds like a store, which CCS is not; "service establishment" is much broader. CCS is selling a service, not goods, and that as we've seen is supportive of the exemption. Demand for services often varies, and when demand drops the seller cannot make up for it, as a maker of goods can do, by producing for inventory rather than for immediate sale.

As a service establishment CCS meets the "retail *or* service establishment" requirement in section 207(i). If that weren't enough (though it is), CCS is probably best described as a retail service establishment. It sells its window-cleaning services to building owners and managers; they are the ultimate customers; they do not resell the window cleaning, and therefore CCS is not a wholesaler. No doubt the building owners and managers pass on (so far as market conditions allow) the cost of window cleaning to the occupants of the building. But that is not resale. It would be absurd to suggest that a dealer in motor vehicles, when it sells a truck to a moving company, is "wholesaling" the truck be-

cause the buyer will doubtless try to recover the cost of the purchase in the price he charges for his moving services, which utilize the truck**.** The opinions cited to us as being contrary—*Gray v. Swanney-McDonald, Inc.*, 436 F.2d 652, 653–54 (9th Cir. 1971); *Goldberg v. Furman Beauty Supply, Inc.*, 300 F.2d 16, 18–19 (3d Cir. 1962); *Goldberg v. Warren G. Kleban Engineering Corp.*, 303 F.2d 855, 857–59 (5th Cir. 1962); *Mitchell v. Sherry Corine Corp.*, 264 F.2d 831, 834–35 (4th Cir. 1959)—involve a different statutory exemption from the commission exemption. See 29 U.S.C. § 213(a)(2); *Idaho Sheet Metal Works, Inc. v. Wirtz*, 383 U.S. 190, 192–94 (1966). Section 213(a)(2) is an exemption for intrastate businesses from the Fair Labor Standards Act's overtime and wage requirements. Although two congressional reports discussing the amendment that added the commission exemption to the Act said that "retail or service establishment" is defined in section 213(a)(2), S. Rep. 145, 87th Cong., first session, p. 27; H.R. 75, 87th Cong., first session p. 9, the reports are not the law and don't explain why a definition meant for the intrastate business exemption should also apply to the commission exemption; the two provisions serve different.

An additional reason to classify CCS as a retailer is that it sells its service to building owners and managers by the building; it doesn't make a new contract for each window on each building. Judged by the unit of sale recognized in the industry, then, CCS is a retailer. Consider by way of analogy a small jeweler selling pearl necklaces to consumers. The jeweler would not be considered a wholesaler of pearls just because each necklace contains more than one pearl.

The plaintiffs argue that the sale of window-washing services to managers of tall buildings "lacks a retail con-

cept," whatever that might mean. The phrase is found in a Department of Labor regulation, 29 C.F.R. § 779.317, which states that

> There are types of establishments in industries where it is not readily apparent whether a retail concept exists and whether or not the exemption can apply. It, therefore, is not possible to give a complete list of the types of establishments that have no retail concept. It is possible, however, to give a partial list of establishments to which the retail concept does not apply. This list is as follows:
>
> Accounting firms.
>
> Adjustment and credit bureaus and collection agencies
>
> Advertising agencies including billboard advertising.
>
> Air-conditioning and heating systems contractors.
>
> Aircraft and aeronautical equipment; establishments engaged in the business of dealing in.
>
> Airplane crop dusting, spraying and seeding firms.
>
> Airports, airport servicing firms and fixed base operators.
>
> Ambulance service companies.
>
> Apartment houses.
>
> Armored car companies.
>
> Art; commercial art firms.
>
> Auction houses
>
> Auto-wreckers' and junk dealers' establishments
>
> Automatic vending machinery; establishments engaged in the business of dealing in.

(Citations omitted.) The list goes on and on. We'll stop with the A's. There is no reference to window washing (though "loft buildings or office buildings, concerns engaged in renting and maintenance of" is included), and, more important, no explanation for the choice of which firms to describe as lacking a retail concept. Most of them sell goods and services to the actual user of the service or product, rather than wholesaling them to a retailer who will resell them to the actual user. We have seen that allowing CCS to claim the exemption for commission sales fits the rationale for the exemption.

The Department of Labor, in an amicus curiae brief that it has filed in this case, embraces the plaintiffs' argument that the building managers who buy CCS's cleaning services "resell" them to the building's occupants, as if the managers were buying mops that they planned to resell to the occupants. The Department accuses the district court of "declin[ing] to defer to the Department's list of businesses lacking a retail concept," found in the regulation, but as we said window washing is not in the list. The brief states that sale to the "general public" is "a fundamental characteristic of a retail or service establishment," but many retailers sell to narrow segments of the public: think of sellers of hospital supplies, or of judges' robes, or of body bags.

Nowhere does the Department engage with the primary reason for treating CCS's window washers as commission workers—their irregular work hours. Nowhere does it suggest that the window washers will be better off if paid overtime, which could induce the company to reduce its hourly wage (for that wage is far above the minimum wage). The Department seems obsessed with its incomplete, arbitrary,

and essentially mindless catalog of sellers lacking "a retail concept"—a catalog that, to repeat, despite its inordinate length does not include window washing. The brief cites departmental regulations that attempt to define a "retail or service establishment" by listing factors of dubious relevance, such as that "75 per centum of [its] annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry," 29 C.F.R. § 779.312, or that the establishment "serves the everyday needs of the community in which it is located." 29 C.F.R. § 779.318. We don't see the connection between these criteria and the reasons for excusing certain employers from the overtime provision of the Fair Labor Standards Act. But nor does CCS fail to satisfy these criteria.

It's no surprise, by the way, that there is no connection. The Department's definition comes from section 213(a)(2), which as we've noted was the intrastate business exemption. This definition made sense in that context: if Congress's purpose was to exempt local mom and pop stores from wide-sweeping federal labor legislation (and not just from the overtime requirement), courts would want to ensure that most of the local stores' output would remain within the state—in other words that they are operating on a small scale in the community. The Department of Labor and some courts, see *Gieg v. DDR, Inc.*, *supra*, 407 F.3d at 1047–49; *Reich v. Delcorp, Inc.*, *supra*, 3 F.3d at 1183 (8th Cir. 1993); *Martin v. The Refrigeration School, Inc.*, 968 F.2d 3, 6–8 (9th Cir. 1992), have woodenly ported the definition from section 213(a)(2) to the commission exemption with no sensitivity to the very different purpose of that exemption.

The plaintiffs make other arguments, but what all their arguments have in common is that they are decoupled from any plausible concern with the welfare of CCS's window washers. They point out that one purpose of the overtime provision of the FLSA is to encourage employers to spread out full-time work among different employees. Fair enough; but giving CCS's window washers overtime pay wouldn't further that purpose because it hasn't been shown that they are on average working more than 2,000 hours a year (50 40-hour work weeks). A second purpose of requiring added pay for overtime is, by discouraging employers from requiring their workers to work overtime, to reduce workplace injuries stemming from fatigue. But CCS has achieved an admirable safety record without paying its workers for working overtime. Finally the requirement of paying extra for overtime is said to be a boon to low-wage workers. But the plaintiffs aren't low-wage workers; their yearly income, as we said, is between $40,000 and $60,000.

So the window washers are well paid. And because of their skills, strength, and daring, and CCS's concern with safety (not only the workers' safety, but the safety of passersby on the sidewalks far beneath the workers and thus far beneath their scaffolds and equipment), their dangerous jobs are actually safe; and their irregular hours of work enable them to enjoy warmth and family in Mexico when it is winter in Chicago. It is no surprise that most of the workers, and their union, want nothing to do with the plaintiffs' case.

It remains to consider the procedural hurdle that we mentioned at the outset of this opinion. Ten days after the appeal was argued, the parties filed a joint stipulation to dismiss it pursuant to Rule 42(b) of the appellate rules.

Normally such stipulations are accepted and the appeal dismissed, though we can decline to do so if necessary to avoid an injustice, and especially to "protect the rights of anyone who did not consent to the dismissal." *Safeco Ins. Co. of America v. American Int'l Group, Inc.*, 710 F.3d 754, 755 (7th Cir. 2013); see also *Noatex Corp. v. King Construction of Houston, L.L.C.*, 732 F.3d 479, 487 (5th Cir. 2013); *Suntharalinkam v. Keisler*, 506 F.3d 822, 827 (9th Cir. 2007) (en banc) (Kozinski, J., dissenting); *American Automobile Manufacturers' Association v. Massachusetts Department of Environmental Protection*, 31 F.3d 18, 22 (1st Cir. 1994).

After initially accepting the stipulation, we became concerned about whether it had received the actual consent of all 24 plaintiffs. Remember that the plaintiffs consist of 24 former and present employees of CCS, that many (maybe all, for all we know) come from the same small town in Mexico, and that they return there—the ones not yet retired mainly in the winter, when the window washing business in Chicago is slow (this winter in Chicago was savage)—to visit with family. We wondered whether they had all been consulted about, and agreed to, the stipulation. We therefore ordered the mandate recalled and the parties ordered to verify to us that each of the 24 plaintiffs had consented to the stipulation and to any settlement underlying it.

The parties have now filed statements in response to our order. The defendant expresses no opinion on whether the plaintiffs consented to the stipulation to dismiss their appeal. It states: "There is no written settlement agreement among the parties. [CCS] agreed to the proposed stipulation to dismiss conditioned upon the payment of certain costs incurred in connection with the appeal, which were in fact paid."

This, if true, means that the plaintiffs not only received nothing in exchange for abandoning their suit, but that they paid the defendant "certain costs." The plaintiffs' statement in response to our order says that "the agreement between the Parties provided that Defendants would receive payment of a compromised amount of litigation costs and that the case would be dismissed. There was no written settlement agreement between the Parties." There is also no indication that the Department of Labor was consulted, despite its having filed an amicus curiae brief in support of the plaintiffs.

The statement goes on to say that the plaintiffs' lawyer "communicated with and obtained authority from each of the 24 Plaintiffs." However, it is apparent from the statement that the only communications were by telephone and that there is no record of what was said by either party to any of the telephone calls—no record either of what the plaintiffs were told or what they said in reply.

Although the plaintiff's attorneys, in paying to dismiss their own case (for remember their agreeing to pay some of the defendants' costs), may be thinking that they might do better re-trying the issue in a new case, that's a type of strategic behavior that we do not encourage. As Judge Kozinski explained in *Suntharalinkam v. Keisler*, *supra*, 506 F.3d at 828, the fact "that petitioner's counsel has filed a motion that can do his client zero good, and possibly great harm, for no apparent reason other than to avoid an adverse ruling that would affect other parties in other cases, militates strongly against exercising our discretion in favor of granting the motion at this late date."

Recently, in a parallel situation, we denied a joint motion to dismiss an appeal pursuant to Rule 42(b), concluding that

"it would be irresponsible to dismiss th[e] case without review." *Americana Art China Co., Inc. v. Foxfire Printing & Packaging, Inc.*, 743 F.3d 243, 246 (7th Cir. 2014). And so it would be here, where we are asked to endorse a most unprofessional way of attempting to end a litigation. But little purpose would be served by our instituting a proceeding to determine whether the plaintiffs gave meaningful consent to the dismissal of their case and to payment of some of the defendant's costs. True, we don't know whether those costs were actually borne by the plaintiffs. They may have been borne by the plaintiffs' attorneys, who, anticipating an adverse opinion, may have concluded that paying the defendant's costs was the lesser evil compared to having to acknowledge an adverse ruling on their appeal. For it is plain from the analysis in this opinion that the plaintiffs' appeal must fail on the merits. Having recalled the mandate, we retain jurisdiction and can decide the merits, and the issuance of our opinion (which was on the verge of completion when the stipulation was filed) provides the cleaner method of disposing of the case. We remain troubled, however, by the unexplained provision regarding compensation of some of the defendant's costs. We therefore order the stipulation dissolved, but the judgment of the district court

AFFIRMED.