In the

# United States Court of Appeals
## For the Seventh Circuit

No. 20-1697

TOM REED and MICHAEL ROY, individually
and on behalf of those similarly situated,

*Plaintiffs-Appellants*,

*v.*

BREX, INC., *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:17-cv-00292-NJR — **Nancy J. Rosenstengel**, *Chief Judge*.

ARGUED NOVEMBER 9, 2020 — DECIDED AUGUST 9, 2021

Before SYKES, *Chief Judge*, and HAMILTON and BRENNAN,
*Circuit Judges*.

HAMILTON, *Circuit Judge*. At the center of this overtime pay
case is a complicated payment scheme for auto repair techni-
cians. The Fair Labor Standards Act generally requires that
covered workers be paid extra for overtime work, but it ex-
empts from that requirement some retail and service employ-
ees who are paid bona fide commissions. Plaintiffs Tom Reed

and Michael Roy are auto repair technicians for defendant Brex, Inc. They claim that Brex's payment plan is not a true commission, so that under the Act they are paid hourly wages and thus are entitled to overtime pay. Brex counters that, when one peels back the layers of its complex payment system, it is in fact a bona fide commission based on each technician's sales during a pay period. The district court granted summary judgment for Brex based on the bona fide commission exemption. We affirm.

I.   *Fair Labor Standards Act*

The Fair Labor Standards Act requires that most covered employees be paid one and a half times their hourly wage for time that they work beyond 40 hours a week. *Yi v. Sterling Collision Centers, Inc.*, 480 F.3d 505, 506 (7th Cir. 2007), citing 29 U.S.C. § 207(a)(1). The Act is full of exceptions, however, and one is that the time-and-a-half requirement does not apply to employees in retail or service establishments if (1) the employee's regular rate of pay exceeds one and a half times the statutory minimum wage and (2) more than half the employee's compensation comes from bona fide commissions on goods or services. § 207(i). The statute does not elaborate further, except to say that "all earnings resulting from the application of a bona fide commission rate shall be deemed commissions on goods or services without regard to whether the computed commissions exceed the draw or guarantee." *Id.*

What counts as a bona fide commission? "The essence of a commission is that it bases compensation on sales, for example a percentage of the sales price, as when a real estate broker receives as his compensation a percentage of the price at which the property he brokers is sold." *Yi*, 480 F.3d at 508. If an employee's "commissions vary in accordance with the

employee's performance on the job," he or she may qualify for exemption. 29 C.F.R. § 779.416(b). Thus, a "commission rate is not bona fide if … the employee, in fact, always or almost always earns the same fixed amount of compensation for each workweek."§ 779.416(c). Likewise, commission plans designed so that employees always receive the same take-home pay with only "slight" upward variances for exceptional sales weeks are not "bona fide." *Id.*

We examined these requirements in detail in *Yi v. Sterling Collision Centers, Inc.*, where we affirmed summary judgment for a similar employer. Like this case, *Yi* was brought by auto repair technicians who worked on a commission basis subject to a convoluted pay algorithm. Noting that commission-based pay for such technicians was widespread and longstanding, we held that the plaintiffs in *Yi* qualified as commission-eligible workers in retail stores or other service establishments. 480 F.3d at 510.

We also explained that commission plans may qualify as bona fide under the Act even if they partially reflect hours worked or if an employer describes them using idiosyncratic terms that do not correspond closely with the Act's language. *Id.* at 508–09. The payment plan in *Yi* recognized that some workers may work collaboratively on big projects and accordingly split commissions for each project based on the number of hours each mechanic worked on the collaboration. The plan also compared actual hours worked to the nominal labor costs charged to the customer. Finally, each employee was paid a different baseline wage based on his or her skills and quality of work. *Id.* at 509. We concluded that this hybrid hourly-commission structure was a bona fide commission as a matter of law because each group's total commission incentivized

efficient work, and pay was "decoupled from actual time worked." *Id.*; see also 29 C.F.R. § 779.416(b) (illustrating that commissions work by varying pay "in accordance with the employee's performance on the job"); *Klinedinst v. Swift Investments, Inc.*, 260 F.3d 1251, 1254–56 (11th Cir. 2001) (similar).

II. *Undisputed Facts and Brex's Payment Plan*

Defendant Brex operates a chain of over two dozen "Car-X" auto repair shops in Illinois and Missouri. Plaintiffs Tom Reed and Michael Roy worked for Brex as auto repair technicians. They also represent other Brex technicians in this collective and class action lawsuit, alleging that Brex's pay scale for auto technicians violates federal and state employment laws that require employees to be compensated at time-and-a-half for overtime hours. Because the parties agree that the state-law claims are co-extensive with the federal ones, we focus on the federal Fair Labor Standards Act, 29 U.S.C. § 201 et seq. It is undisputed that the technicians have worked more than 40 hours per week. The appeal turns on whether Brex pays its technicians a bona fide commission within the meaning of the Act.[1]

Brex's pay scale for its auto technicians has some Rube-Goldberg-esque qualities: to arrive at a technician's take-home pay, Brex starts with the total cost charged to customers for each technician's weekly repairs and applies a series of divisions, multiplications, and additions, some of which are redundant.

---

[1] Before the district court granted Brex's motion for summary judgment, the district court conditionally certified a collective action for the federal wage claims and certified classes for the state-law claims.

First, Brex calculates its total receipts for repairs and sales that a given technician has made during a pay period, excluding tire installations. That total sales number is then divided by hours worked to come up with an average "hourly production." Brex publishes a table to convert bands of "hourly production" to hourly wages (called "hourly commission"). Generally, the calculated hourly wages translate to roughly 16 to 17 percent of the hourly production.

For example, if a technician's hourly production is between $100 and $104.99 per hour during a pay period, Brex's table defines the baseline hourly wage for that pay period as $16.25. In contrast, if that technician's hourly production is between $80 and $84.99 per hour, then the base hourly wage for that pay period is $12.80.

There are a couple of further complications in Brex's pay system. First, tire sales and installation are counted separately. Generally, mechanics are paid $5.00 per tire installed regardless of the tire's cost, but that number jumps to $8.75 per tire if the mechanic installs more than eight tires during a pay period. Also, some mechanics receive hourly bonuses based on having certain auto-repair certifications. The more certificates a technician has, the higher his or her hourly bonus. The magnitude of each hourly bonus is small, though, and even in the aggregate the bonuses are dwarfed by the minimum hourly earnings. The final, adjusted hourly wage is multiplied by hours worked during that pay period.

The hourly wage also has a floor that applies even if the mechanic's hourly production is anemic during the particular pay period. This floor works out to be one and a half times the applicable state minimum wage, rounded up. Plaintiffs Reed and Roy concede that the alternative wage floor is triggered

in only 16 percent of paychecks, meaning that 84 percent of Brex paychecks are paid on the commission scale.

By way of example, say employee A worked 45 hours during a pay period and produced $5,000 in non-tire sales. Employee A also installed six tires and was licensed in electrical repair and as an inspector in Missouri. First, the pay scale would divide total production ($5,000) by hours worked (45) to arrive at an hourly production of $111.11. Using the pay scale converter, any hourly production between $110.00 and $114.99 translates to a base wage of $17.88 per hour (or 16.1 percent of hourly production). Both of this technician's certifications carry an additional bonus of 50 cents per hour, bringing the total hourly wage up to $18.88, and each tire adds $5.00 to the total. Because $18.88 exceeds one and a half times the minimum wage in Illinois and Missouri, that is the applicable hourly wage. So for this week, employee A's gross pay will be 45 hours *times* $18.88 per hour *plus* (six tires at $5.00 per tire) *equals* $879.60.

Next, compare a slightly more efficient employee B, who produced the same amount of sales ($5,000) for just 35 hours of work, holding everything else constant. This technician's hourly production would be $142.86. Using Brex's conversion chart, base hourly pay would be $22.75 (15.9 percent of hourly production), and adjusted hourly pay with certificates would be $23.75 per hour. During this pay period, employee B would be paid (35 hours) *times* ($23.75 per hour) *plus* (six tires at $5.00 per tire) *equals* $861.25. Though employee B worked 22 percent fewer hours than employee A, B would be paid just 2 percent less.

Reed and Roy sued on behalf of 157 Brex technicians claiming that this scheme violates the Fair Labor Standards

Act because they are not paid overtime wages even though they are entitled to time-and-a-half under the Act. Their primary claim is that the pay scale does not reflect a bona fide commission, which would be excepted from the overtime requirements, because it incorporates hours worked in so many steps in computing pay. They also point to Brex's description of its pay plan as providing hourly wages. In further support, the technicians argue that the payment plan does not further the purposes of the time-and-a-half requirement for overtime hours because it does not discourage Brex from requiring its technicians to work long hours. In fact, the evidence shows that Brex technicians regularly work more than 40 hours per week. Finally, plaintiffs advance the disconcerting alternative theory that Brex's minimum wage floor violates the Act because it is *too generous*: they say that employees who fall back on this option for one pay period should have to pay back their excess earnings in subsequent pay periods, though Brex does not actually require such claw-backs from its technicians.

Brex moved for summary judgment on all these theories, arguing that the undisputed evidence showed that the commission structure was bona fide and the guarantee was lawful. The district court initially granted judgment as a matter of law on the first theory, and after Brex moved to reconsider, did so on the second as well, entering final judgment for Brex. Reed and Roy pursue both theories on appeal.

III. *Analysis*

We review a district court's summary judgment ruling de novo, giving the non-moving parties the benefit of conflicting evidence and reasonable inferences from the evidence. *Vesey v. Envoy Air, Inc.*, 999 F.3d 456, 459 (7th Cir. 2021). Summary

judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Reed and Roy's primary claim that they are not paid bona fide commissions fails because the undisputed facts as presented to the district court show that Brex pays each technician based on his or her actual sales. Because pay is proportional and correlated to each technician's sales, the exception applies to Reed and Roy, so that they are not entitled to additional overtime wages. As plaintiffs point out, we have traced the purposes of the general overtime requirement in part to Congress's desire to prevent workers from working dangerously long hours. Yet the fact that Brex's technicians work long hours cannot on its own create an issue of triable fact as to whether they qualify for this statutory exception to the general overtime rule. On appeal, plaintiffs also raise factual issues that were not presented to the district court, and in fact contradict the positions they did take. These arguments were forfeited.

In the district court, Brex moved for summary judgment on the ground that *Yi* foreclosed Reed and Roy's claims. According to Brex, the undisputed evidence showed that each technician's earnings were determined almost entirely as a roughly 16 percent commission on sales, so no reasonable jury could conclude that the pay scale was not bona fide. In opposing the motion, Reed and Roy focused on Brex's repeated description of its plan as "hourly" in the written materials it gave its technicians and in its executives' deposition testimony that hours worked is a factor in calculating take-home pay. The technicians also highlighted that Brex's pay algorithm explicitly incorporates hours worked in several of the

steps for computing pay. Not only does Brex pay an hourly bonus to some well-credentialed technicians, but it also determines an hourly commission by dividing sales by hours worked, and it reports hourly wages. Since Brex pays its technicians an "hourly" wage for each "hour" worked during a pay period, plaintiffs reason, pay is not "decoupled" from time worked, as required by *Yi*.

We understand the point, but as we have said before, "the nomenclature is not determinative." *Alvarado v. Corporate Cleaning Services, Inc.*, 782 F.3d 365, 371 (7th Cir. 2015), citing *Yi*, 480 F.3d at 508 (holding payment plan to be a bona fide commission even though it described itself as a non-exempt "piece-rate" plan). It is uncontested that Brex's payment plan determines weekly pay by dividing sales by hours worked, multiplying by the commission rate of roughly 16 percent, and then multiplying that "hourly" rate by hours worked. The formula is convoluted, but it is mathematically identical to paying a straight commission. First multiplying and then dividing by the same number (hours worked) is equivalent to multiplying by one.

Likewise, the fact that Brex reports an "hourly" wage does not change the nature of the plan. It was undisputed before the district court that the "hourly" wage varies in accordance with a technician's sales in that week. It was therefore a bona fide commission under our precedents, and summary judgment was appropriate. *Alvarado*, 782 F.3d at 367–68 (affirming summary judgment for employer where undisputed facts showed that compensation was "proportional and correlated" to sales receipts); *Yi*, 480 F.3d at 509–10 (affirming summary judgment for employer notwithstanding evidence that employer weighted otherwise bona fide commission formula

by hours worked); see also *Parker v. NutriSystem, Inc.*, 620 F.3d 274, 283 (3d Cir. 2010) (affirming summary judgment for employer where undisputed evidence showed that employee pay was "proportionally related to the charges passed on to the consumer," and rejecting rule that commissions are bona fide only if they are calculated "strictly as a percentage of sale price").[2]

Brex's admissions that technician pay is partially a function of hours worked do not create a triable issue of fact. Obviously, to some extent, technicians who work more hours are likely to have more repair opportunities and therefore make more money. *Yi*, 480 F.3d at 508 (noting that a commission employee's "income is likely to be influenced by the number of hours a week that he works"). And small hourly bonuses for certification do not convert an employee's pay into a standard wage so long as "more than half his compensation … represents commissions on goods and services." 29 U.S.C. § 207(i); see also *Yi*, 480 F.3d at 509 (baseline wages of commission-eligible employees may vary based on skill and quality of work). Here, plaintiffs have not argued on appeal that these "hourly rate" bonuses make up half of their pay, and Brex's pay scale confirms that commission-based hourly payments dwarf any hourly-rate bonuses.

No factual issues preclude summary judgment. With one caveat, which was forfeited in the district court, the terms and

---

[2] Computing each employee's actual hourly wages also seems necessary for employers to ensure that they comply with the exemption, which requires that an exempt employee's regular rate of pay exceed one and a half times the minimum wage. We do not see how the Act could simultaneously require a baseline level of pay and penalize employers who compute and report whether they satisfy it.

impact of the payment plan are not in dispute. Both sides' summary judgment materials were packed with undisputed examples of pay fluctuations—person to person, week to week, and year to year. No reasonable jury could look at that data and conclude that a given technician "always or almost always earns the same fixed amount of compensation for each workweek." 29 C.F.R. § 779.416(c).

Reed and Roy also argue that summary judgment is inappropriate because Brex technicians log, on average, 25 percent more hours than a standard 40-hour workweek, creating, they say, a factual dispute as to whether the commission plan encourages efficient work. This argument stems from our previous discussion of the purposes of the Act's overtime provisions, first adopted in 1938 before the nation had recovered from the Great Depression: (1) preventing workers willing to work longer hours from taking work away from those who prefer shorter hours; (2) spreading work around to more employees to reduce aggregate unemployment; and (3) deterring employers from forcing employees to work long, unhealthy, or dangerous hours. *Mechmet v. Four Seasons Hotels, Ltd.*, 825 F.2d 1173, 1176 (7th Cir. 1987); see also *Alvarado*, 782 F.3d at 371 (concluding that payment plan was bona fide commission in part because seasonal employees did not work more than 2,000 hours per year); *Yi*, 480 F.3d at 510 (similarly noting total hours worked in finding employees were subject to commission exception).

As discussed below, we are not opposed to interpreting vague or ambiguous statutory texts in light of evident purposes, but "no legislation pursues its purposes at all costs." *Rodriguez v. United States*, 480 U.S. 522, 525–26 (1987). We have explained: "Compromises draw unprincipled lines between

situations that strike an outside observer as all but identical. The limitation is part of the price of the victory achieved, a concession to opponents who might have been able to delay or block a bill even slightly more favorable to the proponents." *Chicago Professional Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 961 F.2d 667, 671 (7th Cir. 1992).

For more than eighty years, the detailed and evolving provisions of the Fair Labor Standards Act provide ample proof of the point. From its first enactment in 1938, the scope of the Fair Labor Standards Act has been the subject of complex political and policy compromises and statutory amendments.[3]

The commission exception is one of those statutory exceptions to the general overtime rule adopted as part of the galaxy of compromises essential to passage. Those exceptions

---

[3] For a nearly contemporaneous account of the debates and compromises leading to the 1938 passage, see John S. Forsythe, *Legislative History of the Fair Labor Standards Act*, 6 Law and Contemporary Problems 464 (1939) (concluding at page 489: "few legislative enactments in our history have had such a stormy career"). For a sampling of scholarship considering both the general history of the Act and specific issues and amendments, and showing both the purposes and limits of the Act, see, e.g., Robert N. Willis, *The Evolution of the Fair Labor Standards Act*, 26 U. Miami L. Rev. 607 (1972); William G. Whittaker, *The Fair Labor Standards Act: Exemption of "Executive, Administrative and Professional Employees" Under Section 13(a)(1)*, at 1–7 (Cong. Research Service 2003); William G. Whittaker, *The Fair Labor Standards Act: Continuing Issues in the Debate* (Cong. Research Service 2008); Llezlie Green Coleman, *Rendered Invisible: African American Low-Wage Workers and the Workplace Exploitation Paradigm*, 60 Howard L. J. 61, 84–86 (2016) (summarizing scholarship regarding role of racial considerations in enactment of Act); Megan McGinnis, *Child Farm Labor Under the Fair Labor Standards Act*, 20 Kansas J. L. & Pub. Pol. 155, 167–70 (2010) (summarizing evolution of Act's exclusions of and later coverage of children working on farms), as well as sources cited in these resources.

and compromises should not be undone by courts in the name of achieving broader statutory purposes. E.g., *Covalt v. Carey Canada Inc.*, 860 F.2d 1434, 1439 (7th Cir. 1988) ("laws have both directions and limits, and each must be scrupulously honored"). Employers and employees do not and need not respond to economic incentives imposed by statutory provisions that do not apply to them.

To be sure, evidence that employees regularly work extreme hours can be relevant to whether a complex pay scale actually offers incentives for more efficient work or whether the employees are retail or service workers to begin with. See *Dyal v. PirTano Construction, Inc.*, 2018 WL 1508487, *10–12 (N.D. Ill. Mar. 27, 2018) (denying summary judgment in part and correctly noting that hours worked are not relevant where pay plan is unquestionably a bona fide commission but can affect analysis of evidence showing that commissions are not bona fide). But where the evidence offered to defeat summary judgment shows only that an exception to the Act's overtime requirement has predictable effects on employers and employees, more general statutory purposes will not defeat summary judgment on the application of an exception.

On appeal, Reed and Roy point to a new issue of material fact that they say is disputed. They now claim that the pay plan is not implemented as described and that workers' pay is totally arbitrary. Plaintiffs cite a spreadsheet included as an exhibit in the summary judgment briefing that includes aggregate data about "sales" and "commissions" for each technician-workweek. Plaintiffs' appellate brief includes some new back-of-the-envelope calculations, which show that the pay scale is not a roughly 16 percent commission. In fact, they say, the calculations show that each technician's weekly pay

was not correlated with sales at all, meaning that the alleged commission structure is anything but bona fide. For example, they calculate that one technician's commission rate equaled 11.4 percent of sales in one week, but 64.8 percent of sales in another week, as opposed to the roughly 16 percent that results from using Brex's table.

Plaintiffs are correct that summary judgment would have been inappropriate if there were factual disputes as to whether commissions were actually correlated with sales. An employee compensation algorithm that spits out random numbers does not base compensation on sales and would not be a bona fide commission. See *Yi*, 480 F.3d at 508.

But these arguments are at least forfeited and perhaps waived. "Summary judgment is the proverbial put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 973 (7th Cir. 2020) (cleaned up). It is therefore incumbent on the party opposing a summary judgment motion to "inform the district court of the reasons why summary judgment should not be entered." *Riley v. City of Kokomo*, 909 F.3d 182, 190 (7th Cir. 2018). Parties who fail to bring record evidence to the district court's attention risk forfeiting their right to rely on it on appeal. *Wrolstad v. Cuna Mutual Ins. Society*, 911 F.3d 450, 455 (7th Cir. 2018).

Reed and Roy did not present these new calculations to the district court. In fact, they did not even dispute Brex's assertions that technician pay was determined using the pay scale as described above. All their arguments were built on that foundation. Plaintiffs' new factual argument is not a mere

"appellate amplification of a properly preserved issue." *Lawson v. Sun Microsystems, Inc.*, 791 F.3d 754, 761 (7th Cir. 2015).

All the evidence underlying these new calculations was available to plaintiffs during the summary judgment briefing, yet they did not bring them to the attention of the district court or give Brex an opportunity to explain or clarify them. These lapses are especially problematic because the calculations that plaintiffs now cite do not explicitly separate out tire sales and commissions, rendering the spreadsheets inconclusive at best. Accordingly, this appeal is not the "rare situation" in a civil case where we would review the district court's decision for plain error, and Reed and Roy may not raise these novel issues of fact on appeal. See *Henry v. Hulett*, 969 F.3d 769, 786 (7th Cir. 2020) (en banc) ("our ability to review for plain error in civil cases is severely constricted"); *Wrolstad*, 911 F.3d at 455.

We are now left only with Reed and Roy's unusual alternative argument that they were paid *too much*. The genesis of this argument is the statute's command that "all earnings resulting from the application of a bona fide commission rate shall be deemed commissions on goods or services without regard to whether the computed commissions exceed the draw or guarantee." 29 U.S.C. § 207(i). The plaintiffs claim that the Department of Labor's interpretative regulations forbid Brex's alternative wage floor because the regulations define any wage "guarantee" as a draw against future commissions that requires reconciliation in subsequent pay periods. Reed and Roy contend, in essence, that because Brex did not claw back its technicians' guarantee payments, *all* compensation up to the guarantee was actually fixed hourly wages even in weeks where the guarantee did not apply. If plaintiffs were

correct and the bulk of each technician's commissions should be redefined as "wages," that would prevent Brex from satisfying the exception's requirement that more than half of an employee's income come from commissions. *Id.*

Reed and Roy rely almost exclusively on the regulations' use of the phrase "a guarantee or draw against commissions," which they read as "guarantee[,] or [,that is,] draw against commissions." See 29 C.F.R. § 779.416(b). Their position is not without support, though neither of the district court decisions on which they chiefly rely hinges on this regulatory phrase. See generally *Tillis v. Southern Floor Covering, Inc.*, 2018 WL 4571924 (S.D. Miss. Sept. 24, 2018) (assuming that a guarantee without claw-back provisions was de facto salary); *Keyes v. Car-X Auto Service*, 2009 WL 4136586 (S.D. Ohio Nov. 20, 2009) (similar, adopting magistrate judge's report and recommendation). The parties have not cited, and we have not found, a federal appellate opinion on this issue.[4]

We are not persuaded by Reed and Roy's argument. We begin with the statutory text, which implicitly but plainly permits a "draw or guarantee." § 207(i). "Guarantee" normally means a promise that a condition will be fulfilled. E.g., Black's Law Dictionary, *Guarantee* (11th ed. 2019) ("The assurance that a contract or legal act will be duly carried out."). It is hard to see how compensation would be "guaranteed" if the employee must relinquish some of the guaranteed money. Though plaintiffs argue that reading "guarantee" and "draw"

---

[4] The Sixth Circuit considered a similar payment plan in *Stein v. HHGregg, Inc.*, 873 F.3d 523, 529–30 (6th Cir. 2017), though that case involved a "draw" against commissions and did not address whether guarantees without claw-back provisions meet the statutory and regulatory requirements.

to mean the same thing somehow avoids redundancy, this interpretation has things backwards. The plain meaning of the Act allows employers to implement either a guarantee or a draw, which are two distinct arrangements.

Department of Labor regulations explain that employers may smooth the peaks and valleys of a commission-based payment model, without losing application of the bona fide commission exception, by providing employees with "periodic payments, which are described variously in retail or service establishments as 'advances,' 'draws,' or 'guarantees.'" 29 C.F.R. § 779.416(a). Guarantees may be acceptable in cases "where the employment arrangement is that the employee will be paid the stipulated sum, or the commission earnings allocable to the same period, whichever is the greater amount." *Id.* The regulations are sensitive to Congress's choice of language regarding guarantees. If the payments are greater than commissions, it "may or may not be customary under the employment arrangement" for the employer to claw back excess payments. *Id.*

"If [] it appears from all the facts and circumstances of the employment that the stipulated sum … actually functions as an integral part of a true commission basis of payment, then such compensation may qualify as compensation which 'represents commissions on goods or services.'" *Id.* "Thus an employee who is paid a guarantee or draw against commissions computed in accordance with a bona fide commission payment plan or formula under which the computed commissions vary in accordance with the employee's performance on the job will qualify for exemption…." § 779.416(b).

Brex's payment plan, as described before the district court, meets these flexible criteria. The regulation allows that the

guarantee can operate as an alternative minimum floor, and Brex's alternative minimum floor is thus within the regulatory ambit. And the Department's suggestion that an employer "may or may not" recoup excess payments shields Brex against the exact argument that Reed and Roy now raise.

To be sure, the regulations admonish that further inquiry may be needed to determine whether the guarantee is actually part of a bona fide commission system. This guidance appears to be driven by the concern that an employer will implement a sham "guaranteed commission" that employees will almost never exceed—and when they do, the marginal commissions will be minimal. See § 779.416(c).

But the undisputed evidence presented to the district court shows that the Brex payment plan is a bona fide commission because pay is highly responsive to sales performance and varies in accordance with sales. Likewise, this guarantee is the exception, not the rule: Brex's technicians are paid on a true commission basis 84 percent of the time. This is not a case where an employer offers a nearly insurmountable baseline wage threshold or allows only "slight" upward deviations for exemplary performance. See *id.*

Reed and Roy invoke the regulation's observation that a guarantee "can never represent commissions, of course, if it is actually paid as a salary." § 779.416(a). Distinguishing a guarantee from a salary can involve the fact-intensive task of determining whether the guarantee "actually functions as an integral part of a true commission basis of payment." *Id.* But plaintiffs did not cite any evidence before the district court or on appeal tending to show that any technicians were paid on a salary basis, that is, that they received an "agreed compensation for services … usually paid at regular intervals on a

yearly basis, *as distinguished from an hourly basis*." Black's Law Dictionary, *Salary* (11th ed. 2019) (emphasis added). To the contrary, the undisputed evidence shows that the technicians were paid commissions the overwhelming majority of the time and that the commissions were not a sham.

Even if the Act and regulations were ambiguous as applied to the Brex pay system, our reading also avoids an improbable, even perverse, outcome. The entire point of the Act is to require or encourage employers to pay their employees more, not less. Yet Reed and Roy say that Brex should have paid them less by docking their pay during weeks of plenty to compensate for the lean weeks. The statute and regulations do not require us to find that an employer violates the Act by paying its employees more than necessary. We will not strain to read them to arrive at that odd result.

Reed and Roy argue that genuine issues of material fact preclude summary judgment on this theory, but their arguments are not persuasive. First, we reject their attempts to cite new facts and calculations for the first time on appeal for reasons we discussed above. Second, plaintiffs characterize regulatory interpretation as a question of fact for the jury—but they do not contest the actual *facts*, which are that Brex technicians are paid a straight commission 84 percent of the time. Plaintiffs have not cited any evidence from which a jury could conclude that the guarantee is actually a salary, even considering the modest hourly bonuses offered to well-credentialed technicians. See *Yi*; 480 F.3d at 510 (affirming summary judgment even though technicians were paid different baseline hourly rates based on skill and experience).

Reed and Roy make other undeveloped factual arguments in favor of reversal, but such arguments and legal arguments

unsupported by pertinent authority are waived. See, e.g., *Williams v. Board of Education of City of Chicago*, 982 F.3d 495, 511 (7th Cir. 2020). They claim that the fact that the guaranteed wage floor is paid for 16 percent of all workweeks raises an issue of fact for the jury as to whether the guarantee operates as an integral part of a true commission system. That figure shows only that the guarantee occasionally guarantees. And the Act permits guarantees. Plaintiffs' observation of this fact, without any citation to relevant authority or attempt to situate Brex's practices within the permissive statutory and regulatory framework, cannot defeat summary judgment on its own. That is especially true here, where the undisputed evidence presented to the district court showed that there was substantial hourly and weekly variation in pay and that the guarantees are therefore "computed in accordance with a bona fide commission payment plan or formula under which the computed commissions vary in accordance with the employee's performance on the job." 29 C.F.R. § 779.416(b).

For these reasons, the judgment of the district court is AFFIRMED.